Brasel *v.* Quickway, Inc. (et al., Appellant).

594

Argued April 13, 1965. Before Ervin, P. J., Wright, Watkins, Montgomery, Jacobs, and Hoffman, JJ. (Flood, J., absent).

*David H. Trushel,* with him *Dickey, McCamey, Chilcote & Robinson,* for appellant.

*Peter P. Liebert, 3rd,* with him *Liebert, Harvey, Herting & Short,* for appellees.

Opinion by Ervin, P. J., June 17, 1965:

William R. Brasel, husband of the claimant in this Workmen's Compensation case, was killed on November 20, 1959 while driving a tractor-trailer unit on the Pennsylvania Turnpike near Bedford, Pennsylvania. The trailer was owned by Jackson Trucking Company (Jackson). The tractor was owned by Brasel. The claim was filed against both Jackson and Quickway, Inc. (Quickway) and the referee entered an award against Quickway only. The Workmen's Compensation Board reversed the referee and found that the decedent was the employe of Jackson at the time of the fatal accident. The court below affirmed the board.

The facts as found by the board are as follows: Brasel, the decedent, was the owner of a 1959 tractor. At the time of the fatal accident, November 20, 1959, a written lease between Brasel and Jackson was in force. Section 5 of that lease was as follows: "5. It is understood that the leased equipment under this agreement is in the exclusive possession, control and use of the authorized carrier LESSEE and that the LESSEE assumes full responsibility in respect to the equipment it is operating, to the public, the shippers, and the INTERSTATE COMMERCE COMMISSION."

Decedent having hauled for Jackson under the aforesaid lease to New York City, entered into a lease with Quickway in Jersey City. This lease was by decedent and Jackson as lessors and Quickway as lessee, whereby lessors leased to lessee the tractor (decedent's) and the trailer (Jackson's) for a single return trip to be used by lessee, Quickway, in transporting bananas to Delaware, Ohio. The lease between decedent and Jackson to Quickway provided as follows: "3. During period of this lease the said vehicle or vehicles shall be solely and exclusively under the direction and control of the lessee who shall furnish insurance coverage as required by the Interstate Commerce Commission for public liability and cargo damage excepting such damages as caused by negligent operation of the equipment or negligence on the part of the driver or drivers as provided by the Lessor."

Going eastward from Indiana, Pennsylvania, to New York City the decedent was operating under the Interstate Commerce Commission rights of Jackson. On the return trip westward the decedent was operating under the Interstate Commerce Commission rights of Quickway. The compensation to be paid by lessee Quickway for the tractor and trailer to haul the bananas was $17.50 per ton. This was the complete payment. No deductions were made for union dues, social

security payments, hospitalization or W-2 payments. Decedent had to pay all of his own costs. Jackson was paying decedent's wages.

The lease between Brasel and Jackson concerned a tractor which was owned by Brasel and which was leased to Jackson on a "permanent" basis and remained in force until either party cancelled the lease by giving 30 days written notice. No such cancellation notice had been given at the time of the fatal accident in this case.

This lease was also subject to the provisions of a collective bargaining agreement between the union of which Brasel was a member and the Truckers Association, of which Jackson was a member. The agreement, inter alia, provided: "In all cases where an employee is instructed to ride or drive on Company or leased equipment, he shall receive full pay as specified in this Agreement; when instructed to deadhead on other than Company or leased equipment, the employee shall likewise receive the full rate of pay as specified in this Agreement, plus the cost of transportation." Although the Central States Agreement provided that Brasel would receive his full pay from Jackson when he was returning from New York to Indiana, there was a verbal understanding that in returning from New York to Indiana, Brasel could make his own arrangements to haul on a "trip lease." When Quickway entered into its lease with Brasel, it made the advance of $75.00 in cash to him and deducted this amount from the total lease cost or rental when it later paid Jackson the amount specified in the lease. No deductions were made by Quickway such as social security, withholding taxes, etc.

The law is well settled as to the general law applicable to borrowed or loaned servants. It is set forth in the opinion of Chief Justice HORACE STERN in the case of *Mature v. Angelo,* 373 Pa. 593, 595, 596, 597,

97 A. 2d 59, as follows: "One who is in the general employ of another may, with respect to certain work, be transferred to the service of a third person in such a way that he becomes, for the time being and in the particular service which he is engaged to perform, an employe of that person: . . . . The crucial test in determining whether a servant furnished by one person to another becomes the employe of the person to whom he is loaned is whether he passes under the latter's right of control with regard not only to the work to be done but *also to the manner of performing it*: . . . . A servant is the employe of the person who has the *right* of controlling the manner of his performance of the work, irrespective of whether he actually *exercises* that control or not: . . . . Where one is engaged in the business of renting out trucks, automobiles, cranes, or any other machine, and furnishes a driver or operator as part of the hiring, there is a factual presumption that the operator remains in the employ of his original master, and, unless that presumption is overcome by evidence that the borrowing employer *in fact* assumes control of the employe's *manner of performing the work,* the servant remains in the service of his original employer: . . . . The mere fact that the person to whom a machine and its operator are supplied points out to the operator from time to time the work to be done and the place where it is to be performed does not in any way militate against the continuance of the relation of employe and employer between the operator and his original master: . . . ." See also *Mitchell v. East Nantmeal Township,* 181 Pa. Superior Ct. 482, 124 A. 2d 150.

The board condensed the problem presented by this case very succinctly and clearly as follows: "It is clear if Brasel's return trip from New York City had been 'dead head', Brasel's death would have been Jackson's responsibility. The question therefore is whether the

arrangement with Quickway altered the situation legally.

"It is also clear that if at the time of the lease with Quickway, the relationship with Jackson were terminated, there would have been no question that Quickway would have been the employer. The apparent complication arises out of the fact that there was no termination of relationship between Brasel and Jackson."

The board, in its opinion, then continued as follows: "We find that when Brasel and Jackson entered into a lease for the return trip with Quickway, it was not only for the benefit of Brasel, but also for Jackson.

"Under these circumstances, in our view, Brasel was still an employee of Jackson. It still maintained control. Brasel was carrying out what Jackson ordered him to do."

There was, in our opinion, evidence to justify the findings of the board and its findings were binding upon the court below and are binding upon us: *Stine v. Borst*, 205 Pa. Superior Ct. 46, 53, 205 A. 2d 650; *Berdy v. Glen Alden Corp.*, 202 Pa. Superior Ct. 525, 528, 198 A. 2d 329.

In the *Stine* case we said, at pages 55 and 57: "Where it is not entirely clear who was the controlling master of the borrowed employe, and different inferences in that regard can fairly be drawn from the evidence, it is for the fact finder to determine the question of agency. . . . The fact finder, the board in this case, found that Borst was the employer and that is controlling upon the court below and is also controlling upon us."

Counsel for Jackson argues that because Brasel was required to check in at Bedford and also was required to call Cleveland, Ohio, between the hours of 8 a.m. and 9 a.m. the following day after loading, this indicated that Quickway had control of Brasel on the re-

turn trip. No other evidence was produced to show that Quickway actually exercised any real control over Brasel on the return trip. Under its lease Jackson actually had the power to exercise control over Brasel and whether it did actually exercise such control is immaterial: *Mature v. Angelo,* supra. There is no evidence in the present case that the original agreement between Brasel and Jackson was terminated, as there was in *Stine v. Borst,* supra. In the present case Jackson authorized Brasel to enter into a lease for the return trip and by so doing it received a benefit by cutting down its own costs.

Order affirmed.